# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

ISG TECHNOLOGY, INC., )
                                 )
           Plaintiff, )
                                 )
v.                                 )      Case No. 20-cv-03345-SRB
                                 )
SECURE DATA TECHNOLOGIES, INC., )
GLENN RINKS JR., and )
DANIEL STRICKLAND, )
                                 )
           Defendants. )

## ORDER

This matter comes before the Court on Plaintiff ISG Technology, Inc.'s ("ISG") Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. #3.) ISG moved the Court for a temporary restraining order ("TRO") against former employees Defendants Glenn Rinks Jr. ("Rinks") and Daniel Strickland ("Strickland"), as well as Defendant Secure Data Technologies, Inc. ("Secure Data"), their current employer. Following a hearing held on November 12, 2020, the undersigned issued a fourteen day temporary restraining order ("TRO"), the terms of which were agreed to by the parties. (Doc. #24.) After receiving notice that the parties had agreed to postpone the earlier-scheduled preliminary injunction hearing and extend the TRO until the new hearing date, the Court subsequently extended the TRO until December 8, 2020.[1] On December 3, 2020, ISG and Defendant Strickland jointly filed a motion for the entry of a consent injunction (Doc. #41), which the Court granted and entered. (Doc. #42.) The instant preliminary injunction Order is thus limited to Defendants Secure Data and Rinks.

---

[1] Counsel for Secure Data indicated to the Court that Secure Data did not consent to postponing the preliminary injunction hearing. However, counsel for Secure Data failed to appear at the Court's telephonic hearing regarding the proposed postponement. Accordingly, the Court treated the request as unopposed and granted the motion extend the TRO.

On December 8, 2020, the Court presided over a preliminary injunction hearing. Counsel for all parties were present. ISG called Chad Workizer, ISG's Technical Services Director, as a witness. ISG also introduced, and the Court admitted, various exhibits in support of its motion. In addition to the evidence and testimony presented during the hearing, the Court has reviewed the Verified Complaint, the instant motion and its supporting exhibits, as well as the opposition filed by Defendants Rinks and all exhibits thereto.[2] Being fully advised in the premises, the Court hereby grants ISG's motion for a preliminary injunction in part as set forth below.

## I. BACKGROUND

For purposes of this preliminary injunction, the relevant facts are set forth below. The Court notes, however, that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citation omitted). ISG is a Kansas corporation providing various information technology services and products to an array of national and global clients. ISG is based in the Kansas City metro area and maintains satellite offices in Kansas, Nebraska, and Missouri, including an office in Springfield, Missouri, where it employed Defendants Rinks and Strickland. Rinks and Strickland left their jobs at ISG on October 2, 2020, to join Secure Data, an Illinois corporation based in St. Louis and competitor of ISG. ISG alleges Rinks and Strickland are in violation of their noncompete, non-solicitation, and non-servicing employment agreements, and contends that Secure Data knowingly interfered with ISG's existing contractual and business relationships by recruiting and hiring Rinks and Strickland. The facts relevant to Rinks are briefly summarized below.

---

[2] Secure Data did not file a response in opposition to ISG's motion for preliminary injunction. During the preliminary injunction hearing, Secure Data expressed no opposition to ISG's motion for preliminary injunction except for asserting that should the Court decide to enjoin Rinks from working with Secure Data, ISG should be required to post an adequate security bond.

ISG hired Rinks on January 8, 2013, where he remained employed until his voluntary resignation on October 2, 2020. As a condition of his employment with ISG, Rinks signed a "Employee Non-Competition and Non-Solicitation Agreement" (the "Employment Agreement") on January 8, 2013, which provides in relevant part:

1. COVENANTS AGAINST COMPETITION. In consideration of either the Employee's initial employment or the Employee's continued employment, and by his/her signature below, Employee acknowledges that his/her services to ISG are of a special character that have a unique value to ISG. Employee further acknowledges that the loss of Employee's services to ISG cannot adequately be compensated by monetary damages. Based on: (I) The unique value of Employee's services to ISG, (II) The confidential and proprietary business information and trade secrets owned by ISG that will be obtained by, or disclosed to Employee; and (III) The material inducement by ISG to employ Employee for services to be rendered to ISG, Employee agrees as follows:

a. During Employee's employment with ISG and for a period of 12 months after such employment ceases, Employee shall not:

(1) Directly or indirectly, own, manage, operate, control, be employed by, perform services for, consult with, solicit business for or be connected with the ownership, management operation or control of any business which performs services materially similar to or competitive with those provided by ISG within a 100 mile radius of the ISG office where Employee was employed, or any other location where ISG has an office as of the Employee's termination date.

(2) Solicit, induce, or attempt to induce, any individual or entity that was a customer of ISG during Employee's employment with ISG to (a) cease doing business in whole or in part with or through ISG; or (b) do business with any person, firm, partnership, or corporation or other entity which performs services materially similar to or competitive with those provided by ISG.

(3) Directly or indirectly, solicit, induce, entice, hire or attempt to hire for himself or for any other person or entity, any other ISG employee.

b. While employed with ISG, Employee shall promptly disclose to ISG, in writing, and eventually assign to ISG, all right, title and interest the Employee has in and to any and all inventions, original works of authorship, developments, improvements or trade secrets ("Intellectual Property") that Employee may solely or jointly conceive, develop, reduce to practice, or cause to be conceived, developed, or reduced to practice, while in ISG's employ,

Case 6:20-cv-03345-SRB   Document 53   Filed 12/16/20   Page 3 of 21

subject however, to any rights in that Intellectual Property retained by Employee in accordance with Kansas law found at K.S.A. 44-130.

2. CONFIDENTIALITY. Employee understands that during the term of his/her employment, because of the nature of his/her responsibilities and the training provided by ISG, Employee will acquire valuable and confidential skills, information, trade secrets, and relationships with respect to ISG's business practices, operations, and customers, all of which represent "confidential information." Such confidential information also includes, but is not limited to customer lists, customer contact information, customer spending information, product sales information, pricing strategies, service schedules, hourly rates, markups, etc. Employee agrees that he/she shall not divulge any such confidential information, directly, or indirectly, intentionally or negligently, to any third party, or any other entity for any reason or purpose, and that he/she shall not make use of such confidential information for his /her own use or purpose. Employee also agrees that his/her obligations under this section shall continue indefinitely, even after Employee ceases employment with Employer for any reason.

(Doc. #1-2, p. 1.) Rinks also agreed to abide by ISG's Code of Business Conduct on May 22, 2014, which also contained confidentiality and noncompete provisions. When his employment with ISG ended, Rinks served as the Senior Enterprise Account Executive at ISG, a high-level position requiring extensive customer knowledge and a close working relationship with many of ISG's key clients. By virtue of his position, Rinks regularly accessed ISG's confidential and proprietary customer information and played a critical role in determining and fulfilling current and potential customer needs. As a result, "Rinks developed and maintained contacts and connections with many network service customers throughout the Midwest." (Doc. #4, p. 5.)

ISG alleges Rinks, in breach of his Employment Agreement, resigned from ISG to take a position with Secure Data and establish a Springfield-based office in direct competition with his former employer. ISG further alleges that Rinks, prior to his resignation and departure, "secretly entered upon a scheme with Secure Data to misappropriate ISG's good will" and, as part of that alleged scheme, downloaded dozens of customer files and confidential customer information to a portable flash drive device. (Doc. #45, p. 5.) ISG also alleges Rinks, while still employed by

4

ISG, actively recruited other ISG employees to leave and join Secure Data—including Defendant Strickland. In total, ISG contends Rinks and/or Strickland solicited business from at least eight ISG customers, and argues that number will continue to grow unless an injunction is put in place.

Regarding Secure Data, ISG alleges Secure Data recruited Rinks, Strickland, and several other Springfield-based ISG employees to join Secure Data despite knowing that doing so would violate noncompete agreements those individuals had signed. ISG also contends that the actions taken by Secure Data constitute tortious interference with ISG's contractual relationships with its employees and its customers. ISG filed a verified complaint on November 2, 2020, asserting the following causes of action against Rinks and Strickland:

- Count I: Injunctive Relief;
- Count II: Declaratory Judgment;
- Count III: Breach of Employment Agreement;
- Count IV: Breach of Fiduciary Duty and Duty of Loyalty;
- Count V: Unfair Competition;
- Count VI: Misappropriation of Trade Secrets;
- Count VII: Violation of Computer Fraud and Abuse Act; and
- Count IX: Tortious Interference with Prospective Business Relationships.[3]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, the Court may issue a preliminary injunction. Fed. R. Civ. P. 65(a). To determine the propriety of injunctive relief, courts must consider four factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the threatened harm and the injury the injunction will inflict

---

[3] ISG additionally asserts the following causes of action against Secure Data: (1) Count VIII: Tortious Interference with Contract; and (2) Count IX: Tortious Interference with Prospective Business Relationships (asserted against all Defendants).

Case 6:20-cv-03345-SRB   Document 53   Filed 12/16/20   Page 5 of 21

on other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). All four factors must be examined "to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citations and quotation marks omitted). "[I]n considering these factors, the court may properly consider evidence that would ordinarily be inadmissible, such as hearsay, in support of granting a preliminary injunction." *H&R Block Tax Servs., LLC v. Santiago*, No. 19-CV-00154, 2019 WL 1415466, at *1 (W.D. Mo. Mar. 28, 2019) (citation omitted). Additionally, "while no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation and quotation marks omitted). The burden of establishing the need for a preliminary injunction lies with the moving party. *Baker Elec. Co-op.*, 28 F.3d at 1472.

### III. DISCUSSION

The agreed-upon TRO currently in place restrains Rinks from engaging in any of the following activities, directly or indirectly:

> A. Soliciting, inducing, or attempting to induce, any individual or entity that was a customer of ISG during Rinks' employment with ISG to cease doing business in whole or in part with or through ISG. If Rinks is contacted by any ISG customer with whom Rinks had any dealings or contact while Rinks was an ISG employee, Rinks shall refuse to communicate with that customer and will not refer that customer to any one at Secure Data.

> B. Directly or indirectly, soliciting, inducing, enticing, hiring or attempting to hire for himself or for any other person or entity, any other ISG employee.

> C. Divulging any of ISG's confidential business information, including but not limited to, customer lists, customer contact information, customer spending information, product sales information, pricing strategies, service schedules, hourly rates, and markups, directly, or indirectly, intentionally or negligently, to any third party, or any other entity for any reason or purpose, or making use of such confidential information for his own use or purpose.

6

(Doc. #24, pp. 1–2.)  Additionally, Secure Data agreed "that it will continue to not receive, use, or disclose any confidential business or customer information of ISG that Rinks or Strickland may have in their possession."  (Doc. #24, p. 2.)  During the preliminary injunction hearing, ISG asked the Court to continue these provisions of the TRO and further enjoin Rinks by preventing him from maintaining his employment with Secure Data.  In turn, the primary issue before the Court is whether Rinks should be preliminarily enjoined from being employed with Secure Data, and if such action is necessary to "preserve the status quo and prevent irreparable harm" until the Court has the opportunity to rule on the lawsuit's merits.  *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994).

### A.  Likelihood of Success on the Merits

In evaluating the likelihood of success on the merits, a court does not decide whether the movant will "ultimately win."  *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991); *see also O'Connor v. Peru State College*, 728 F.2d 1001, 1002 (8th Cir. 1984) (noting that at the preliminary injunction stage, a "court should avoid deciding with any degree of certainty who will succeed or not succeed").  Instead, a court considers whether the movant's position is fairly supported by governing law.  *See Glenwood Bridge*, 940 F.2d at 371; *see also Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (affirming district court's finding that the state statute at issue "is likely preempted by federal law").  In turn, this factor necessarily requires the Court to consider the law applicable to ISG's claims.

A district court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state.  *Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co.*, 325 F. 3d 1024, 1028 (8th Cir. 2003) (citation omitted).  Missouri courts recognize that parties may choose the state whose law will govern the interpretation of their contractual rights and duties.  *State ex rel.*

*McKeage v. Cordonnier*, 357 S.W.3d 597, 600 (Mo. banc 2012) (noting "[a] valid choice of law provision in a contract binds the parties").  Missouri courts routinely enforce the choice of law provisions in noncompete agreements and will uphold such a provision so long as it does not violate a fundamental policy of Missouri law.  *Consol. Fin. Investments, Inc. v. Manion*, 948 S.W.2d 222, 224 (Mo. App. E.D. 1997).  The parties agree that Kansas law governs the Court's interpretation of Rinks's Employment Agreement pursuant to the Agreement's valid choice-of-law provision.[4]

To establish the likelihood of success on a breach of a noncompete or non-solicitation contract claim, ISG must show the restrictive covenant is both reasonable and enforceable under Kansas law.  Generally, "[a] noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare."  *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996).  Kansas courts, in assessing the reasonableness of a noncompetition clause, consider whether the covenant at issue: (1) protects a legitimate business interest of the employer; (2) creates an undue burden on the employee; (3) is injurious to the public welfare; and (4) contains reasonable time and territorial limitations based on the circumstances.  *Id.* at 90.  Additionally, the restrictive covenant must be ancillary to an otherwise lawful contract and supported by valid consideration.  *Wichita Clinic, P.A. v. Louis*, 39 185 P.3d 946, 951 (Kan. Ct. App. 2008) (citations omitted); *accord Digital Ally, Inc. v. Corum*, No. 17-CV-02026, 2017 WL 1545671, at *6 (D. Kan. Apr. 28, 2017).

---

[4] ISG's instant motion limits its arguments to its breach of contract claims against Rinks and Strickland (Count III), and do not identify or discuss the legal requirements for its other claims.  The Court, in turn, limits its analysis on the likelihood-of-success factor to ISG's breach of contract claim.

### 1. Reasonableness of Employment Agreement

ISG argues its noncompete, non-solicitation, and confidentiality clauses protect ISG's legitimate interests in maintaining and preserving its "close customer relationships," "knowledge of its customers' needs," "relationships with customers' decision-makers," and its "confidential pricing guidelines and strategies," including the relationships and knowledge Rinks developed over the course of his employment due to ISG's ongoing training and investment in him. (Doc. #4, p. 25.) ISG argues these same legitimate interests also serve the public interest and enjoining Rinks in the manner requested will not impact the availability of its services, create a monopoly, or otherwise injure the public welfare. Rinks disagrees, arguing ISG's noncompete provision is only designed to avoid ordinary competition and that his work at Secure Data does not, and will not, depend "on any special skills" he developed as an ISG employee. (Doc. #21, p. 22.) Rinks states that under Kansas law, he "has the right to take with him all the skill he has acquired, all the knowledge he has obtained, and all the information he has received [from ISG], so long as nothing is taken that is the property of the employer[.]" (Doc. #21, p. 22) (citing *Allen, Gibbs & Houlik v. Ristow*, 94 P.3d 724, 728 (Kan. Ct. App. 2004)) (citation omitted).

The interests identified by ISG are well-recognized under Kansas law as legitimate and entitled to protection. *See Digital Ally, Inc.*, 2017 WL 1545671, at *8 (citing *Tillman*, 913 P.2d at 92) ("Kansas courts have recognized that customer contacts, special training of employees, trade secrets, confidential business information, loss of clients, good will, and reputation all qualify as legitimate business interests."); *see also E. Distrib. Co., Inc. v. Flynn*, 567 P.2d 1371, 1377 (Kan. 1977) (noting the protection of customer contacts is a legitimate business interest, particularly where the employee is "the sole or primary contact with the customers and . . . a close personal relationship with them is fostered"). During the preliminary injunction hearing, in

its Verified Complaint, and in support of its briefing on this motion, ISG adduced evidence that illustrated how closely Rinks worked with ISG clients and how his position gave him the opportunity to develop very close relationships with customers and gain intimate, detailed knowledge about the needs of those clients. Indeed, the evidence reveals that Rinks appears to be performing largely the same duties at Secure Data as the position he held at ISG. There is also evidence that Rinks accessed and downloaded ISG client files onto a flash drive prior to his departure, though the current whereabouts of that flash drive and its digital contents are unknown and unaccounted for. In short, the restrictive covenants do not appear to be solely enacted to restrain competition, and the evidence adduced so far indicates that enforcing the Employment Agreement against Rinks will help protect ISG's legitimate business interests. Further, given that ISG's business interests are legitimate, ISG's decision to sue Rinks to enforce the terms of the Employment Agreement does not render the Agreement contrary to public policy or injurious to the public welfare. *See, e.g.*, *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1152–53 (D. Kan. 2007) (finding a noncompete agreement that protects legitimate business interests is not rendered anti-competitive simply because the employer has decided to enforce the agreement). Both the legitimate business interest factor and the public welfare factor thus weigh in ISG's favor.

As for whether the noncompete factor imposes an undue burden on the employee, Kansas courts consider the time and territorial restrictions imposed by the restrictive covenant. *Digital Ally, Inc.*, 2017 WL 1545671, at *10 (citing *Wichita Clinic*, 185 P.3d at 955; *Caring Hearts Pers. Home Servs., Inc. v. Hobley*, 130 P.3d 1215, 1222-23 (Kan. Ct .App. 2006)). Rinks does not argue the one-year time restriction set forth in the Employment Agreement is unreasonable, and Kansas courts readily uphold time restrictions of similar or greater length. *See, e.g.*, *Bruce*

*D. Graham, M.D., P.A. v. Cirocco*, 69 P.3d 194, 199 (Kan. Ct. App. 2003) ("We are not bothered by this covenant's 2–year restriction. Such a time period is common in Kansas noncompetition clause cases.").  Since the time restriction here is reasonable, the undue burden question turns on the territorial limitation.  The Employment Agreement precludes Rinks from working for any competitor located "within a 100 mile radius of the ISG office where [Rinks] was employed, or any other location where ISG has an office[.]"  (Doc. #1-2, p. 1.)  ISG contends this limitation is reasonable because the Springfield office that employed Rinks served clients throughout the southern Missouri and southeastern Kansas region.  ISG also argues Rinks has "plenty of other employment opportunities" and is "not prohibited from providing other types of non-competing services" in other businesses or industries during the one-year time limitation period.  (Doc. #4, p. 27.)  Rinks disagrees, stating the geographic limit, as written, "covers virtually all of Kansas, Missouri, Oklahoma, and parts of Arkansas," a vast geographic area that effectively forces Rinks to leave the industry or relocate out of the Midwest—both outcomes that would impose an undue burden on Rinks, particularly in the midst of a global pandemic.  (Doc. #21, p. 24.)

The Court finds the geographic limitation is overbroad as it relates to the other ISG office locations.  The evidence adduced thus far shows that Rinks operated out of the Springfield ISG office and a majority of his customers were located in the region.  The evidence also shows that most of the current or former ISG clients which have been contacted by Secure Data and/or Rinks are based in the Springfield area, though the Court acknowledges not all of Rinks's former ISG clients fall neatly within that 100-mile radius.  Taken together, the geographic limitation of a 100-mile radius from the Springfield-based office appears to be reasonably calculated to protect ISG and its legitimate business interests.  However, extending that 100-mile limitation to include all ISG offices—including regions where Rinks did not work or regularly operate—appears too

11

expansive based on the present facts and circumstances. *Cf. Wichita Clinic*, 185 P.3d at 955; *see also Flynn*, 567 P.2d at 1378 (citations omitted) (noting that "[w]here the territory designated in a contract . . . is found to be more extensive than necessary to provide reasonable protection against professional encroachment, courts . . . have the power to reduce such territory to the extent reasonably necessary to insure the contemplated protection[.]"). The time and geographic limitation as it relates to the Springfield office weighs in ISG's favor, while the more expansive clause of the geographic limitation may impose an undue burden on Rinks and thus weighs in his favor. In any event, ISG demonstrates a probability of success on the merits in that its position remains fairly supported by Kansas law, which is the showing required at this preliminary stage. *See Glenwood Bridge*, 940 F.2d at 371.

## 2. Enforceability of Employment Agreement

As for whether the Employment Agreement is enforceable under Kansas state law, Rinks argues: (1) the noncompete covenant was not executed ancillary to a contract of employment; (2) ISG breached the Employment Agreement first by unilaterally changing Rinks's compensation structure; and (3) ISG waived its right to enforce the noncompete agreement by failing to enforce it against other former ISG employees. ISG, in refuting each argument, cites applicable law and identifies facts or circumstances which it believes makes the case distinguishable.

Upon reviewing the arguments, the evidence presented, and the relevant law cited by the parties, the Court determines that ISG has satisfied its burden of showing the enforceability of Rinks's Employment Agreement at this early stage. While there is support for ISG's position in the law, the evidence and disputed facts reveal that there remain serious and substantial questions about the merits of this issue—issues which are difficult, fact-intensive, and will benefit from the litigation process and more thorough fact discovery. *See Universal Engraving, Inc.*, 519 F.

Supp. 2d at 1154 (citation omitted) (finding "there are questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation"); *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1098 (D. Minn. 1973) (citation and quotation marks omitted) ("To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after trial, be absolutely certain . . . ; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."). ISG has put forth sufficient evidence to establish a breach of contract warranting preliminary injunctive relief, and the issue of the noncompete clause's enforceability is an issue best reserved for resolution on the merits. *See Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 937 (8th Cir. 2002).

In sum, after considering the reasonableness factors and enforceability considerations of Rinks's Employment Agreement, the Court finds that ISG has satisfied its burden regarding the likelihood of its success on the merits. For that reason, continuing the agreed-upon terms of the TRO by enjoining Rinks from soliciting prior ISG clients or disclosing confidential information is warranted. As for ISG's request that Rinks be enjoined from remaining employed with Secure Data, however, the Court declines to require Rinks to take such affirmative action before a trial on the merits has occurred, given that factual questions remain about the enforceability of the noncompete agreement. *See Digital Ally, Inc*., 2017 WL 1545671, at *11 (citation omitted) (noting that where a plaintiff seeks a mandatory injunction, e.g. one requiring affirmative action by the defendant, "it must make a strong showing both with regard to the likelihood of success

13

on the merits and with regard to the balance of harms"); *Universal Engraving, Inc.*, 519 F. Supp. 2d at 1150 (holding the same).

### B. Threat of Irreparable Harm to the Movant

"Regardless of the strength of its claim on the merits, a movant for a preliminary injunction should show a threat of irreparable harm." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) (citation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Id.* "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (citation and quotation marks omitted).

ISG contends it is actively suffering irreparable harm due to the actions taken by Rinks in violation of his Employment Agreement, and states such harm will continue to unfold unless the Court grants its requested relief. Specifically, ISG produces evidence showing an actual loss of its former employees (e.g. Strickland) and a potential loss of its current and former customers as a result of Rinks's actions and conduct. ISG states "the profits [it] stands to lose from the loss of its customers and employees to Secure Data" cannot be readily calculated, nor can "the damages caused by [the] disclosure of ISG's confidential information"—damages that ISG characterizes as "permanent." (Doc. #4, pp. 21–23.) Rinks argues the harm alleged by ISG is too speculative and insists ISG "has not provided any evidence to corroborate its conclusory allegations that its business interest have been damaged by [Rinks's] activities or employment with Secure Data." (Doc. #21, p. 13.)

The Court finds ISG satisfies its burden on this factor and establishes that not only has it already suffered irreparable harm, but it also faces an imminent threat of similar future harm. The present facts show Rinks successfully recruited at least one of his fellow ISG coworkers to join him at Secure Data and attempted to recruit others. ISG also adduced evidence showing multiple current and former clients of ISG had been contacted by Rinks and/or Secure Data and, as a result, were contemplating moving their business portfolio to Secure Data or had already taken steps to do so. Taken together, these facts show both an actual and threatened loss of employees, customers, income, and/or future revenue due to solicitation—circumstances that both Kansas and Missouri courts recognize as presenting a sufficient threat of future harm. *See, e.g., Chem-Trol, Inc*., 2009 WL 331625, at *4–*5; *Universal Engraving, Inc*., 519 F. Supp. 2d at 1149; *Express Scripts, Inc. v. Lavin*, No. 17-CV-01423, 2017 WL 2903205, at *7 (E.D. Mo. July 7, 2017). The Court finds it would be extremely difficult, if not impossible, to determine the economic value of ISG's eroded goodwill, lost employee capital, or the diminished sales and revenue suffered by ISG (both presently and in the future) due to Rinks's resignation from ISG and his subsequent employment by Secure Data in violation of his Employment Agreement.

Furthermore, ISG adduces evidence showing that prior to his resignation from ISG, Rinks accessed and downloaded ISG's confidential and proprietary customer information. During the injunction hearing, the credible testimony of Chad Workizer corroborated the sensitive nature of the information Rinks had purportedly accessed. The Court acknowledges Rinks's assertion that he no longer possesses the information he allegedly downloaded onto a flash drive, as well as Secure Data's representation that it has instructed Rinks not to "use or disclose any of ISG's confidential or proprietary information" on its behalf. (Doc. #21, p. 13.) However, the present facts support the inference that Rinks and Secure Data have used ISG's proprietary information

15

to compete with ISG and have attempted to divert its business, including the evidence that eight ISG clients have been actively solicited by Rinks and/or Strickland. Further, the disclosure of confidential and proprietary business information is a genie that cannot easily be put back in its bottle. *See, e.g.*, *Digital Ally, Inc.*, 2017 WL 1545671, at *3 (citation omitted) ("a plaintiff may establish irreparable harm by such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position").

ISG thus offers more than just a speculative risk of harm; it shows both a current and continued risk of actual harm to ISG's business viability, its customer base, its competition position within the marketplace, and its goodwill, which together is more than adequate to satisfy its burden under this factor. *See Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) (citation omitted) ("[L]oss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm."). Moreover, monetary damages alone will not be able to compensate ISG for those losses given their intangible nature. ISG presents sufficient and substantial evidence demonstrating the actual and imminent losses it may suffer, and the Court finds such harm is likely to occur before this case can be resolved on the merits.

### C. Balance of Harms

In considering the balance of harms factor, a court weighs "the threat of irreparable harm shown by the movant against the injury that granting the injunction will inflict on [the other party]." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quotation marks omitted) (citing *Dataphase*, 640 F.2d at 113). In arguing how this factor weighs in ISG's favor, ISG largely repeats its earlier argument that the irreparable harm it faces outweighs the fact that Rinks may be restrained from working with a direct competitor for a year

pursuant to the terms of his Employment Agreement. Rinks disagrees, contending ISG's alleged harm should be given less weight because it is speculative and unsupported by evidence. Rather, Rinks "will undoubtably suffer extreme hardship" if he is "forced to leave [his] employment with Secure Data." (Doc. #21, p. 17.)

As for continuing the previously agreed-upon terms of the TRO, the Court agrees that the balance of harms favor ISG. As discussed earlier, the adduced evidence persuades the Court that Rinks may possess information that can be used to cause irreparable harm to ISG in the form of lost human capital, lost customers, decreased revenue, eroded goodwill, the public disclosure of private and confidential information, and a diminished competitive position. The potential harm facing ISG outweighs the deprivations that will result from enforcing the terms of a contract that Rinks himself agreed to. *See, e.g.*, *Ronnoco Coffee LLC v. Peoples*, No. 20-CV-1401, 2020 WL 6875754, at *8 (E.D. Mo. Nov. 23, 2020) (citation omitted) (noting that the defendant "accepted significant financial and other benefits from his employment with [the plaintiff] and he should not now be relieved of his own obligations"); *Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 846–47 (8th Cir. 2005) (noting "[defendant] knowingly and voluntarily agreed to be restricted by the covenant, and any perceived harm to him by the enforcement of the agreement is outweighed by the harm foreseeable to [the plaintiff].").

As for ISG's request that Rinks be enjoined from working from Secure Data entirely, the Court agrees with Rinks. Rinks already left his employment at ISG and is currently working at Secure Data. Forcing him to leave that position and forgo the salary, benefits, and job security in the midst of a global pandemic before the merits of this case have been decided would impose a serious and significant deprivation. While Rinks may indeed be free to pursue other sales jobs in other industries not in competition with ISG, the ability of Rinks to do so in this current climate

is less certain. Given the other relief granted by this Court, and since the harm which may result from terminating Rinks's current employment outweighs the risk of irreparable harm facing ISG at this time, the Court finds ISG will be sufficiently protected until the trial on the merits can occur. However, as the Court advised the parties at the conclusion of the preliminary injunction hearing, should the Court discover that either Rinks or Secure Data is actively violating the terms of this preliminary injunction, it will promptly schedule an expedited hearing on the matter and, if proper, impose immediate sanctions—including the termination of Rinks's employment with Secure Data if appropriate.

### D. Public Interest Considerations

Lastly, a court should consider the possible harm to the public interest if the preliminary injunction is granted. *Dataphase Sys., Inc.*, 640 F.2d at 113. ISG argues the public interest is best served by enforcing contractual agreements and the prevention of unfair competition, while Rinks contends that forcing him to leave his employment at Secure Data would interfere with his "right to exercise his trade or calling." (Doc. #21, p. 19.) On balance, the Court finds that the enforcement of Rinks's Employment Agreement as stated below best serves the public interest, though the Court acknowledges there remain factual questions regarding the enforceability of the noncompete covenant at issue in this case.

In sum, after considering the *Dataphase* factors in light of the current evidentiary record, the Court finds ISG satisfies its burden of showing it is entitled to preliminary relief. In light of ISG's likelihood of success on the merits, the risk of irreparable harm it faces, and the balance of equities and public interests, the Court grants ISG the preliminary injunctive relief as set forth below. As stated above, the Court notes this Order does not constitute a final decision on the merits. In turn, any findings of fact in this ruling, as well as any conclusions of law forming part

of the Court's determination about whether the issuance of a preliminary injunction in this case is proper, are not considered final.

### E. Bond Requirement

Rule 65(c) requires a plaintiff to post a bond "in an amount the court deems proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Due to Defendants' prior agreement to the TRO and successfully arguing for continued employment, the bond is set at a relatively low $1,000. This amount should provide adequate protection in this case since Rinks may remain employed by Secure Data and the activities that Rinks is enjoined from engaging in arise from terms he contractually agreed to in the Employment Agreement.

### F. Motion to Strike Verification

On December 4, 2020, ISG filed its Verified Reply Suggestions in support of its motion for a preliminary injunction. (Doc. #45.) Attached as an exhibit to the reply was a verification submitted by Walter Hirsekorn, stating "the foregoing is true and correct." (Doc. #45-1.) On the eve of the preliminary injunction hearing, Rinks filed a motion to strike the verification attached to ISG's reply. (Doc. #48.) Rinks states the verification "presents no statements, assurances, or foundation that Mr. Hirsekorn has direct knowledge of the facts outlined in the Reply," and thus the verification must be struck "because [Hirsekorn] has not provided any foundation for his knowledge[.]" (Doc. #48, pp. 1–2.)

As a preliminary matter, the Court notes the motion to strike does not cite to any local or federal rule of civil procedure, evidence, caselaw, or legal authority. Consequently, the Court is forced to guess what the legal basis for the motion is. The Court construes the motion to strike as one arising under Rule 12(f), which permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A reply brief is not a

"pleading" as defined by Rule 7(a), nor is a verification submitted in support of a reply brief.

*See* Fed. R. Civ. P. 7(a); *see also, e.g.*, *Jiang v. Porter*, No. 15-CV-1008, 2015 WL 9480478, at

*6 (E.D. Mo. Dec. 29, 2015) (noting "a Rule 12(f) motion to strike is not the proper avenue for

challenging plaintiff's memorandum in opposition to the motion to dismiss") (collecting cases

finding the same). In turn, the motion to strike (Doc. #48) is denied.[5]

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that ISG's Motion for Temporary Restraining Order

and Preliminary Injunction (Doc. #3) is GRANTED IN PART, to the extent that Defendant Rinks

is hereby preliminarily restrained and enjoined from engaging in any of the following activities,

directly or indirectly, whether alone or in concert with others, from the date of this Order:

(1) Divulging any of ISG's confidential business information, including but not limited to, customer lists, customer contact information, customer spending information, product sales information, pricing strategies, service schedules, hourly rates, and markups, directly, or indirectly, intentionally or negligently, to any third party, or any other entity for any reason or purpose, or making use of such confidential information for his own use or purpose.

(2) Soliciting, inducing, or attempting to induce, any individual or entity that was a customer of ISG during Rinks's employment with ISG and which Rinks had any dealings or contact while he was an ISG employee to cease doing business in whole or in part with or through ISG. If Rinks is contacted by any ISG customer with whom Rinks had any dealings or contact while Rinks was an ISG employee, Rinks shall refuse to communicate with that customer and will not refer that customer to any one at Secure Data.

(3) Directly or indirectly, soliciting, inducing, enticing, hiring or attempting to hire for himself or for any other person or entity, any other ISG employee.

---

[5] To the extent Rinks contends the Court should disregard the verification for evidentiary reasons, the Court underscores that it is not making final factual findings on the evidence in this case. As the United States Supreme Court has explained, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

(4) Working with any client located within a 100-mile radius of the ISG office located in Springfield, Missouri.

Additionally, it is **FURTHER ORDERED** that Defendant Secure Data is hereby preliminarily restrained and enjoined from engaging in any of the following activities, directly or indirectly, whether alone or in concert with others, from the date of this Order:

(1) Soliciting, inducing, or attempting to induce any individual or entity that was a customer of ISG during Rinks's employment with ISG and which Rinks had any dealings or contact while he was an ISG employee. If Secure Data is contacted by any ISG customer with whom Rinks had any dealings or contact while Rinks was an ISG employee, Secure Data shall refuse to communicate with that customer. These restraints shall remain in effect for the duration of Rinks's first year of employment with Secure Data.

(2) Using any of ISG's confidential business information, including but not limited to, customer lists, customer contact information, customer spending information, product sales information, pricing strategies, service schedules, hourly rates, and markups, directly, or indirectly, intentionally or negligently, for its own use or purpose.

It is **FURTHER ORDERED** that should any issues arise relating to the failure of Defendants Rinks or Secure Data to follow the directives of this Order, upon motion of Plaintiff the Court shall hear such matters on an expedited basis and, where appropriate, impose any sanctions necessary to effectuate the terms of this Order.

It is **FURTHER ORDERED** that within fourteen (14) days of this Order, ISG shall remit to the Clerk of Court proof of security or a bond in the amount of $1,000.

Lastly, it is **FURTHER ORDERED** that Rinks's Motion to Strike (Doc. #48) is **DENIED.**


**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
Dated: December 16, 2020                   UNITED STATES DISTRICT JUDGE

21